UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PRIME INSURANCE COMPANY,
INC.,

      Plaintiff,

v.
                                  Case No.:  2:24-cv-421-SPC-KRH

MEDICAB TRANSPORTATION,
LLC, JASON RHODES, and DALE
JOHNSON,

      Defendants/Counterclaim
      Plaintiffs,

v.

PRIME INSURANCE COMPANY, INC.,

      Counterclaim Defendant,

and

PRIME PROPERTY & CASUALTY
INSURANCE, INC.,

      Third-Party Defendant.

---

## **OPINION AND ORDER**

Before the Court are three motions for summary judgment: one filed by

Plaintiff/Counterclaim Defendant Prime Insurance Company ("Prime") (Doc.

156); a partial one filed by Defendants/Counterclaim Plaintiffs Medicab

Transportation, LLC ("Medicab"), Jason Rhodes, and Dale Johnson

(collectively "Medicab Defendants") (Doc. 155); and another filed by Third-Party Defendant Prime Property & Casualty Insurance, Inc. ("PPCI") (Doc. 153). The parties responded in opposition (Docs. 169, 170, 171) and replied (Docs. 175, 177, 179). With leave of Court, Medicab Defendants also filed supplemental evidence supporting their motion. (Docs. 180-1, 180-2). For the below reasons, the Court grants in part Prime's motion, grants PPCI's motion, and denies Medicab Defendants' motion.

## Background

This insurance coverage dispute is anything but straightforward. It is convoluted and circular at times, and the parties' dreadful briefing only exacerbates the issues. Below is the Court's best attempt to comprehensively portray the relevant events.

Medicab provides paratransit services for individuals with medical needs. Part of such services involves loading and unloading patients into and out of the medical vans. In 2021, Medicab purchased two insurance policies: a Business Auto Policy issued by PPCI ("Auto Policy") and a Commercial Liability Policy issued by Prime ("Commercial Policy").[1] The Auto Policy includes a per-person liability limit of $100,000, and a per-accident liability limit of $300,000. The Commercial Policy has a $1 million limit. As originally

---

[1] PPCI and Prime are sister entities owned by Claims Direct Access ("CDA").

drafted, both policies provided coverage for accidents related to loading and unloading patients into or from certain vehicles.

On September 21, 2021, Margaret St. Aubin[2] was on a lift being unloaded from a Medicab van when she fell and injured her back. The Estate demanded $1 million from Medicab—the coverage limit of the Commercial Policy. Medicab filed a claim. Upon reviewing the claim, CDA and Prime were apparently surprised that both the Commercial and Auto Policies extended coverage for the incident. In their view, when issuing the policies, both Prime and Medicab intended that only the Auto Policy would cover loading/unloading accidents, given such accidents arise in the context of automobiles. In short, they interpreted the loading/unloading coverage provision under the Commercial Policy as a mistake.

On July 27, 2022, CDA amended the Commercial Policy. It prepared General Change Endorsements that removed the pertinent language extending loading/unloading coverage. (Doc. 169-1 at 4–5; Doc. 169-8). Separately, on August 5, PPCI acknowledged coverage under the Auto Policy and offered the full $100,000 policy limit to settle the Estate's claim. (Doc. 153-5 at 2).

---

[2] St. Aubin eventually passed away, and the Estate pursued her claims. Although she was alive during some of the underlying events, the Court references her as the Estate throughout this Order for consistency.

3

During this time, various CDA agents communicated with Medicab about the Commercial Policy and the mistaken inclusion of loading/unloading coverage. On August 1, Brittany Harden, CDA's Vice President of Claims, sent Martin Ndungu, Medicab's President, an email summarizing their prior oral discussions. She wrote:

> I am writing to confirm our conversations over the last month regarding this claim. During those conversations, we discussed both your [Commercial] and Auto Liability policies, and you explained to us that your understanding and intent of the [Commercial] policy is that there is no coverage for the use of your autos, including but not limited to, loading and unloading persons onto those autos. Your intent and understanding is that you purchased a separate auto liability policy to cover that liability arising from that type of activity. Please confirm that this accurately reflects those conversations and your intent and understanding of those policies.

(Doc. 169-22 at 10).

Ndungu did not immediately confirm Harden's summary. He instead emailed Cindy Anderson[3] and sought clarification of coverage. Specifically, he asked (1) how his employees are covered when loading and unloading patients from the vehicles, (2) the parameters for commercial liability coverage, and (3) whether Medicab needed umbrella coverage. (Doc. 169-22 at 12). Anderson referred Ndungu to risk management, which she stated "will have those answers for you[.]" (*Id.*; Doc. 169-14 at 7).

---

[3] It is unclear from the record who Cindy Anderson is, but Medicab Defendants maintain she is an agent of CDA, Prime, and PPCI.

4

Ndungu also had some follow-up questions for Harden.  He asked her which policy covered loading and unloading of clients and whether he needed additional coverage for such activity.  He also inquired whether Medicab should purchase umbrella coverage or separate coverage moving forward to cover transfer and loading/unloading of patients.  (Doc. 169-22 at 14).  Three days later, Harden responded, indicating she tried to call to discuss further, and she asked Ndungu to advise when he is available.  (*Id.*).

On August 16, Anderson wrote to Ndungu, "As far as I understand there is no coverage on the [Commercial] policy for loading and unloading this is not a coverage we offer, you do however have the Loading & unloading coverage on your Auto policy[.]"  (Doc. 169-14 at 8).  The following day, Ndungu responded, "loading and unloading on the auto is all we needed I was under the impression that we do not have loading or unloading."  (*Id.*).

On August 17, Harden sent Ndungu another email outlining a prior telephone conversation.  She memorializes:

> As discussed, I just wanted to confirm our telephone conversation from earlier today.  Specifically, you reiterated that your understanding and intent of the [Commercial] policy is that there is no coverage for the use of your autos, including but not limited to, loading and unloading persons onto those autos.  Your intent and understanding is that you purchased a separate auto liability policy to cover liability arising from the use of your scheduled autos, including but not limited to, loading and unloading persons onto those autos.

> Separately, you told us that you'd like to discuss a potential increase of your auto liability limit moving forward, and our underwriters will follow-up with you directly regarding any potential additions and the costs associated with that.
>
> Please confirm that this accurately reflects our conversation and that it accurately reflects your understanding and intent for coverage under your policies with Prime.

(Doc. 169-22 at 16–17). The next day, Ndungu responded to this email, "Agreed, Brittany." (*Id.*).

Despite unambiguously agreeing with Harden in writing that Medicab never intended for the Commercial Policy to include coverage for loading/unloading persons from vehicles, Ndungu asserts none of Harden's email is true. Rather, he maintains he only "agreed" with Harden's statements because she advised doing so was in Medicab's best interest and would ultimately settle the Estate's claim for $100,000. (Doc. 169-22 at 8). Medicab Defendants maintain Prime tricked Ndungu into "agreeing" to Harden's email to create a record of "mutual mistake" to use in court.

On November 4, Prime brought a declaratory judgment action in Utah state court against Medicab that sought to reform the Commercial Policy due to Prime and Medicab's mutual mistake and to otherwise determine its obligations under the Commercial Policy. *See Prime Ins. Co. v. Medicab Trans., LLC*, Case No. 2220906706 (Third Jud. Dist. Ct. of Salt Lake Cnty,

6

Utah 2022) (hereinafter, "Utah action"); (*see also* Doc. 80-19).  In the complaint,

Prime requested a declaration that:

> (1) The Commercial Policy does not conform to the parties' intent due to mutual mistake in that it includes language providing additional coverage already provided under the Auto Policy;
> (2) The Commercial Policy should be reformed to accurately reflect the agreement and intent of the parties that no coverage be provided for claims arising out of the use, operation, etc. of automobiles;
> (3) There is no coverage under the Commercial Policy for the St. Aubin claim inasmuch as that claim arises out of Medicab's use of an automobile;
> (4) As coverage is precluded, Prime has no obligation to defend or indemnify Medicab for the Estate's claim.
> (5) As coverage is precluded, Medicab has no right of recovery against Prime for the Estate's claim.

(Doc. 80-19 ¶ 52).

Although Medicab was properly served, it did not appear or contest the

Utah action.  But Ndungu claims Medicab's failure to appear is Prime's fault.

According to Ndungu, Harden advised him the Utah action was just part of the

settlement process, and a declaratory judgment would move the Estate's claim

toward settlement.  Ndungu also maintains Harden failed to advise him that

the Utah action was adversarial and would affect Medicab's coverage under

the Commercial Policy, that Medicab needed to take independent action, or

that the Utah action sought to reform the Commercial Policy.  (Doc. 169-22 ¶¶

8–11).  In Ndungu's view, Medicab did not appear or contest the Utah action based on Harden's limited representations.[4]

Whatever the reason, Medicab's failure to appear resulted in the Utah court entering final default judgment in Prime's favor in March 2023.  (Doc. 80-23).  The court's declaration tracked the language in Prime's complaint. (*Id.*).[5]

Despite the declaratory judgment reforming the Commercial Policy, the Estate did not settle for the Auto Policy's $100,000 limits.  On May 1, 2023, the Estate filed a personal injury lawsuit in Lee County Circuit Court against Medicab.  *See Estate of Margaret St. Aubin v. Medicab Transportation, LLC*, 23-CA-006166 (20th Jud. Cir. in Lee Cnty. Fla. 2023) (hereinafter "the Estate action").  The Estate later amended the complaint to add Johnson and Rhodes—the Medicab employees and transportation specialists responsible for transporting St. Aubin.  (*Id.*).

About a year later, Prime filed this declaratory action against the Estate and Medicab Defendants seeking essentially the same relief the Utah judgment provided.[6]  (Doc. 1).  Really, Prime seeks to extend the Utah court's

---

[4] As far as the Court is aware, Medicab has made no effort to set aside the Utah judgment

[5] Prime domesticated the Utah judgment in Lee County, Florida on October 31, 2023.  (Doc. 11 ¶ 30); *Prime Ins. Co. v. Medicab Trans. LLC*, 23-CA-009956 (20th Jud. Cir. in Lee Cnty. Fla. 2023).

[6] Prime settled its claim against the Estate, and the Court terminated the Estate as a party. (Doc. 166).

declaration to the Estate, Rhodes, and Johnson, given they were named defendants in the Estate action but not the Utah action. (Doc. 11). In response, Medicab filed an amended counterclaim against Prime and a third-party complaint against PPCI. (Doc. 80).

While this case has been pending, the Estate action concluded with an arbitration award and judgment against Medicab Defendants of $412,440.71.[7] (Doc. 170-15 at 24–26); *see also St. Aubin*, 23-CA-006166, Doc. 212 (May 15, 2025). Obviously, this amount exceeds the Auto Policy's $100,000 policy limit. So without coverage under the Commercial Policy, Medicab Defendants are on the hook for the remaining $312,440.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

---

[7] Of note, the state court docket reflects that, per the parties' agreement, the court vacated the judgment and dismissed the case with prejudice. *See St. Aubin*, 23-CA-006166, Doc. 235 (Jan. 8, 2026). However, the parties do not raise this issue, so the Court assumes it is not relevant.

9

The moving party bears the initial burden to show a lack of genuinely disputed material fact. *Clark v. Coats & Clark,* 929 F.2d 604, 608 (11th Cir. 1991). If carried, the burden shifts to the nonmoving party to point out a genuine dispute. *Id.* At this stage, a court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002). That the parties have filed cross-motions for summary judgment does not alter the standard. *See United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)).

## Analysis

Given the intricacies of this case, the Court first breaks down each party's claims. Then, the Court turns to the merits.

As mentioned, Prime brought this action seeking a declaration that (1) there is no coverage under the Commercial Policy for any claim from the Estate action or the underlying incident, and (2) Prime has no duty to defend Medicab Defendants in connection with the Estate action or the underlying incident. (Doc. 11).

10

In response, Medicab Defendants brought counterclaims against Prime for breach of contract (count I), breach of the covenant of good faith and fair dealing (count II), and declaratory judgment (count III).  The crux of these claims is that Prime breached the Commercial Policy by failing to provide coverage and failing to defend Medicab Defendants in the Estate action.  They also brought counterclaims against Prime and a third-party complaint against PPCI for breach of fiduciary duty (count IV), misrepresentation and nondisclosure (count V), and negligent misrepresentation and nondisclosure (count VI).    In sum, Medicab Defendants allege that Prime and PPCI repeatedly misrepresented to Medicab that the Commercial Policy did not cover the Estate's claim.[8]  (Doc. 80).

Prime moves for summary judgment on its declaratory judgment claim and on each of Medicab's counterclaims.  Its primary argument is that the Utah judgment is entitled to full and faith and credit, so Medicab Defendants' counterclaims are barred by res judicata.  (Doc. 156).  PPCI moves for summary judgment on Medicab Defendants' breach of fiduciary duty and misrepresentation claims.  (Doc.  153).  And Medicab seeks partial summary

---

[8] Medicab Defendants also brought counts IV through VI against CDA.  (Doc. 80).  But the Court dismissed CDA as a third-party defendant because Medicab Defendants failed to timely join it.  (Doc. 117).

judgment on its breach of contract and declaratory judgment claims. (Doc. 155).

An overarching issue that resolves most of the claims is whether res judicata applies. Because this determination guides the analysis, the Court tackles it first.

## A.      Full Faith and Credit and Res Judicata

Prime argues the Utah declaratory judgment is entitled to full faith and credit and precludes Medicab Defendants' counterclaims. When federal courts "are asked to give *res judicata* effect to a state court judgment, we must apply the *res judicata* principles of the law of the state whose decision is set up as a bar to further litigation." *Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1308 (11th Cir. 2006) (cleaned up) (citation and quotation marks omitted); *see also Kahn v. Smith Barney Shearson Inc.*, 115 F.3d 930, 933 (11th Cir. 1997) ("Under the Full Faith and Credit Act, 28 U.S.C. § 1738, a federal court must give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered." (cleaned up and citation omitted)). So the Court applies Utah res judicata principles.

"The doctrine of res judicata embraces two distinct branches: claim preclusion and issue preclusion." *Macris & Assocs., Inc. v. Neways, Inc.*, 16 P.3d 1214, 1219 (Utah 2000). "Claim preclusion involves the same parties or their privies and also the same cause of action, and this precludes the

relitigation of all issues that could have been litigated as well as those that were, in fact, litigated in the prior action." *Id.* (citations omitted). "Issue preclusion, on the other hand, arises from a different cause of action and prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit." *Id.* (citation omitted); *see also Mack v. Utah State Dep't of Com., Div. of Sec.*, 221 P.3d 194, 203 (Utah 2009) ("Claim preclusion corresponds to causes of action; issue preclusion corresponds to the facts and issues underlying causes of action."). "Therefore, while both branches of res judicata serve the important policy of preventing previously litigated issues from being relitigated, different rules govern each branch." *Macris & Assocs.*, 16 P.3d at 1219 (cleaned up and citation omitted).

Prime argues claim preclusion bars Medicab Defendants' counterclaims. But for claim preclusion to apply, Prime must show Medicab could or should have brought the counterclaims in the Utah action. *See id.* "[A] party is required to include claims in an action for res judicata purposes only if those claims arose before the filing of the complaint in the first action." *Id.* at 1220 (cleaned up). The Court is not convinced Medicab Defendants' counterclaims arose before Prime filed the Utah action, so claim preclusion is inapplicable.

That said, issue preclusion—or collateral estoppel—may otherwise apply. So the Court analyzes issue-preclusion principles. Either way, Medicab Defendants insist the Utah judgment has no preclusive effect.

13

For collateral estoppel to bar a subsequent claim, four elements must be satisfied: (1) the issue challenged must be identical in the previous action and in the present case; (2) the issue must have been decided in a final judgment on the merits in the previous action; (3) the issue must have been competently, fully, and fairly litigated in the previous action; and (4) the party against whom collateral estoppel is invoked in the current action must have been either a party or privy to a party in the previous action. *Id.* at 1222 (citation omitted). All four elements must be present for issue preclusion to apply. *Id.*

### 1.  Party in Previous Action

The Court first considers whether Medicab, Johnson, and Rhodes (the parties against whom Prime invokes collateral estoppel) were parties or privies to a party in the Utah action. The Utah action involved Prime and Medicab only, not Johnson and Rhodes. Medicab Defendants seize on this point. But it makes no difference because Medicab was party to the Utah action, and Johnson and Rhodes are in privity with Medicab.

"The legal definition of a person in privity with another, is a person so identified in interest with another that he represents the same legal right." *Press Pub., Ltd. v. Matol Botanical Int'l, Ltd.*, 37 P.3d 1121, 1128 (Utah 2001) (citation omitted). "Thus, privity depends mostly on the parties' relationship to the subject matter of the litigation." *Id.* (citation omitted). "Following this rationale, final adjudication of plaintiff's claims bars subsequent litigation

14

concerning the same subject matter against officers or owners of a closely held corporation, partners, co-conspirators, agents, alter egos or other parties with similar legal interests." *Id.*; *see also Daz Mgmt., LLC v. Honnen Equip. Co.*, 508 P.3d 84, 94 (Utah 2022) ("For parties to be in privity, their legal interests and rights must be substantially aligned when considered in relation to the subject matter of the litigation.").

Johnson and Rhodes are Medicab's employees who, like Medicab, assert they are covered under the same policy. Coverage under the Commercial Policy was the very basis of the Utah action and the present action. Their interests are thus substantially aligned. Consequently, the facts and issues decided in the Utah judgment bind Johnson and Rhodes despite their absence from the Utah action.

### 2. Final Judgment on the Merits

Although the Utah declaratory judgment resulted from a default, "Utah law clearly indicates that default judgment is a judgment on the merits." *Jenkins v. Prime Ins. Co.*, No. 2:21-CV-00130-DAK, 2021 WL 3726620, at *8 (D. Utah Aug. 23, 2021). So this element is easily satisfied.

### 3. Fully and Fairly Litigated

Utah law does not clearly establish whether an issue was fully and fairly litigated in the declaratory default judgment context. "When the declaratory judgment arises from a default, Utah courts haven't squarely decided whether

15

the issue had been fully and fairly litigated." *Jenkins v. Prime Ins., Co.*, No. 23-4113, 2024 WL 4040386, at *4 (10th Cir. Sept. 4, 2024). Fortunately, the Tenth Circuit, analyzing Utah law and the Restatement (Second) of Judgments, addressed the issue. *See id.* It concluded that when a party receives notice of the proceeding and has an opportunity to appear and contest the issues, the defaulted issues were fully and fairly litigated. *Id.* at *5. The Court finds the Tenth Circuit's analysis persuasive.

Medicab was served with the Utah complaint, and Ndungu acknowledges he knew of the Utah action. (*See generally* Doc. 169-22). Medicab thus had an opportunity to appear in the Utah action and contest Prime's position. So the issues decided in the Utah action were fully and fairly litigated.

Medicab Defendants resist this conclusion. They essentially argue Harden tricked Medicab into not appearing in the Utah action by telling Ndungu it was a non-adversarial proceeding and failing to disclose that Prime sought to reform the policy. Arguing Harden's representations and omissions led to Medicab's nonappearance and eventual default, Medicab Defendants

16

assert Prime prevented Medicab from presenting its case and, consequently, the Utah action was not fairly litigated.[9]  (Doc. 170 at 27–28).

Two problems.  First, Medicab knew or should have known Prime sought to reform the Commercial Policy because Prime outlined this precise relief in the Utah complaint, which it served on Medicab.  So Prime did not withhold this information.  If Medicab opposed reformation, it could have appeared in Utah court immediately after reading the complaint.  Second, there is no evidence that Harden (or anyone else from CDA or Prime) advised Ndungu the Utah action was non-adversarial.  Rather, Ndungu asserts that Harden *failed to* advise him the proceeding was adversarial.  (Doc. 169-22 at 4–5).  Either way, Ndungu separately advised Harden that he *agreed* with the premise of the Utah action (Doc. 169-22 at 16), which sought a declaration that the Commercial Policy's inclusion of loading/unloading coverage was due to mutual mistake.  So, at that time, the Utah action technically was *not* adversarial, as Harden purportedly advised, and Medicab had no reason to appear.

Nothing in the record suggests Prime prevented Medicab from appearing in the Utah action, only that it did not aid it in doing so.  Despite Medicab Defendants' contention, Prime's failure to hold Medicab's hand through the

---

[9] Medicab Defendants raise this argument when claiming the Utah action is void for fraud (discussed below).  But the Court finds the argument equally applicable to the "fully and fairly litigated" element and discusses it here.

Utah action does not demonstrate they were "so cheated, imposed upon, or unfairly dealt with that it should shock the conscious of the court to allow [the prior judgment] to stand[.]" (Doc. 170 at 25 (quoting *McBride v. Jones*, 615 P.2d 431, 433 (Utah 1980)). And Medicab Defendants cite no persuasive authority to the contrary. Put simply, Medicab had every opportunity to appear and contest the Utah action. It chose not to do so.

### 4.   Identical Issues

With three of the four elements satisfied, the final and perhaps most critical element requires that the issues in Medicab Defendants' counterclaims were litigated in the Utah action. But the Court does not address this element here. For efficiency, the Court applies this final element when analyzing the merits of each counterclaim. (*See infra* §§ B–D).

### 5.   Medicab Defendants' Other Arguments

Medicab Defendants raise a few other unconvincing arguments to avoid the Utah judgment's preclusive effect. They first argue the judgment is invalid because the Estate should have been party to the Utah action. Incorrect. "[T]he Utah Supreme Court has held that injured third parties—like [the Estate]—aren't proper parties in actions for declaratory relief as to the terms of an insurance policy." *Jenkins*, 2024 WL 4040386, at *5 (citing *Utah Farm Bureau Ins. Co. v. Chugg*, 315 P.2d 277, 281 (Utah 1957)). So not only did Prime not need to include the Estate in the Utah action, it could not do so.

Medicab Defendants also argue the Utah judgment cannot have preclusive effect because it is void for fraud. Essentially, they argue that the Utah complaint and a supporting affidavit included fraudulent misrepresentations, and Prime deceived Medicab into not appearing by claiming the action was non-adversarial (which the Court previously addressed). But this fraud-on-the-court argument fails for multiple reasons.

If Medicab believed Prime procured the Utah judgment by fraud, it had means of setting aside that judgment. For instance, Utah Rule of Civil Procedure 60(b)(3) permits a court to set aside a default judgment for fraud, misrepresentation, or other misconduct of an opposing party. Medicab made no effort to do so. Although a court can entertain an independent common law action to set aside a judgment for fraud, *see St. Pierre v. Edmonds*, 645 P.2d 615, 618 (Utah 1982), Medicab Defendants do not bring such a claim or request such relief in their counterclaim. Instead, they ask the Court to set aside the Utah judgment for the first time in their response to Prime's summary judgment motion. (Doc. 170 at 24–27). Even if the Court was willing to entertain such an ill-timed request,[10] as explained below, it is not this Court's place to set aside a state-court judgment purportedly procured by fraud.

---

[10] Raising new claims or requests for relief at summary judgment is impermissible. *See Brown v. Jefferson Cnty. Sheriff's Dep't*, 806 F. App'x 698, 700 (11th Cir. 2020) ("Despite the liberal pleading standard for civil complaints, plaintiffs may not raise new claims at the summary judgment stage."); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th

The Court declines Medicab Defendants' invitation to set aside the Utah judgment for two reasons.  First, "[a] majority of circuits agree that the proper forum to raise a claim of fraud upon the court is the court which allegedly was a victim of that fraud."  *McLemore v. McLemore*, No. 1:26-CV-208-RAH-CWB, 2026 WL 915535, at *3 (M.D. Ala. Apr. 3, 2026) (collecting cases).  So the proper forum for Medicab Defendants' fraud complaints is Utah.  Second, the *Rooker-Feldman* doctrine[11] precludes this Court from nullifying the Utah judgment on such grounds.  *See Sanchez*, 840 F. App'x at 421 (concluding *Rooker-Feldman* barred the appellant's claim to declare a state-court foreclosure judgment "void and null" due to fraud because she "had the opportunity to raise it before the state court[,] and a federal finding of fraud would effectively nullify the state-court foreclosure judgment"); *Velazquez v. S. Fla. Credit Union*, 546 F. App'x 854, 859 (11th Cir. 2011) (declining to adopt a fraud-on-the-court exception to the *Rooker-Feldman* doctrine); *Day v. Devries*, No. 22-3107, 2023 WL 3842664, at *3 (10th Cir. June 6, 2023) (declining to entertain independent action to set

---

Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

[11] "The *Rooker-Feldman* doctrine is a jurisdictional rule that bars lower federal courts from reviewing state-court judgments.  It precludes state-court losers from subsequently filing a federal case and inviting district courts to review and reject that judgment."  *Sanchez v. Ocwen Loan Servicing, LLC*, 840 F. App'x 419, 420 (11th Cir. 2020) (citations omitted).  "The *Rooker-Feldman* doctrine may be raised *sua sponte* by the Court."  *Hirsch v. 18th Jud. Cir. Ct. of Fla.*, No. 6:21-CV-1920-CEM-LHP, 2022 WL 3136891, at *5 (M.D. Fla. May 27, 2022), report and recommendation adopted as modified, 2022 WL 2449760 (July 6, 2022) (citing *Bell v. Sykes*, 682 F. App'x 736, 737 (11th Cir. 2017)).

aside a Kansas judgment procured by fraud because the *Rooker-Feldman* doctrine precluded such consideration and the appellant could have done so in Kansas court); *LeCates v. Barker*, 242 F.3d 389 (10th Cir. 2000) ("In order to grant LeCates relief on his fraud claim, it would be necessary to determine that the Utah state court default judgment was fraudulently obtained and therefore void. We therefore conclude that the fraud claim is barred by the *Rooker-Feldman* doctrine."); *Kitchi Ditlihi Tr. by & Through Tr. Robert Arnaz Rackard v. Alvaro*, No. 6:24-CV-1877-JSS-RMN, 2025 WL 296537, at \*5 (M.D. Fla. Jan. 24, 2025) ("[B]ecause Plaintiff's claim of fraud can prevail only at the expense of the state court judgment itself, it is barred by *Rooker-Feldman*.").

Medicab Defendants also insist that because Prime did not bring a reformation claim in the Utah action, any judgment reforming the policy due to mutual mistake is not binding. Wrong again. Utah Rule of Civil Procedure 54(c)(1) provides: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." In its Utah complaint, Prime asserted that the Commercial Policy does not conform to the parties' intent due to "mutual mistake" and requested that it "be reformed" to reflect the parties' intent. (Doc. 80-19 at 9). So the Utah default judgment reforming the policy did not exceed the scope of the complaint. Although Prime sought such relief through declaratory judgment rather than bringing a reformation claim, the Utah Supreme Court has held that a complaint for declaratory relief is

sufficient to request reformation due to mutual mistake. *See Guardian State Bank v. Stangl*, 778 P.2d 1, 8 (Utah 1989) (citing *Mabey v. Kay Peterson Constr. Co.*, 682 P.2d 287, 290 (Utah 1984)) ("[T]he complaint for a declaratory judgment was a sufficient request for [reformative] relief[.]").

In short, to the extent Medicab Defendants' claims arise from issues previously addressed in the Utah action (discussed below), they are collaterally estopped from relitigating them.

## B.    Medicab Defendants' Contract and Declaratory Judgment Counterclaims (counts I–III)

In count I, Medicab Defendants allege Prime breached the Commercial Policy by denying coverage, refusing to pay the $1 million coverage limit, and failing to defend Medicab Defendants in the Estate action.[12] (Doc. 80 ¶ 96). In count II, Medicab Defendants allege the same failures amount to a breach of the covenant of good faith and fair dealing. (*Id.* ¶¶ 100–01). And in count III, they seek a declaration that the Commercial Policy has not been reformed and Prime must pay the judgment in the Estate action. (*Id.* ¶ 105). But Medicab Defendants cannot relitigate these issues.

---

[12] They also allege Prime breached the Commercial Policy by "[s]eeking to induce and mislead Medicab to retroactively reform the [Commercial Policy] to eliminate coverage[.]" (Doc. 80 ¶ 96b). But Medicab Defendants fail to establish what provision of the policy this conduct breached, and the Court can find none. Plus, this claim is nothing more than Medicab Defendants' misrepresentation (tort) claims in the guise of a contract claim.

The Utah judgment addressed the very issues Medicab Defendants raise in counts I through III. Specifically, the Utah court held that: (1) the Commercial Policy "is reformed to accurately reflect the agreement and intent of the parties that no coverage be provided for claims arising out of the use, operation, etc. of automobiles" and included the revised language, (2) there is no coverage under the Commercial Policy for the Estate's claim, and (3) Prime "has no obligation to defend or indemnify" Medicab for the Estate's claim. (Doc. 11-7). Because Medicab Defendants base their contract and declaratory claims on these very issues that the Utah court already determined, they are precluded. *See Jenkins*, 2024 WL 4040386, at *5–6 (the district court did not err in dismissing breach of contract claims that relitigated the issues previously determined by Utah default declaratory judgment); *Jumlist v. Prime Ins. Co.*, No. 1:21-CV-01416-SCJ, 2022 WL 610402, at *7 (N.D. Ga. Jan. 25, 2022), *aff'd sub nom.*, 92 F.4th 1008 (11th Cir. 2024) (finding, under Utah law, the plaintiffs were collaterally estopped from litigating the policy limits because of a prior Utah default declaratory judgment).

One claim requires a bit more discussion. In count II, Medicab Defendants also allege Prime breached the implied covenant of good faith and fair dealing by retroactively eliminating insurance coverage rather than investigating the Estate's claim or providing coverage under the Commercial Policy. (Doc. 80 ¶ 101). In other words, they allege that reforming the

23

Commercial Policy was itself a breach of the implied covenant. Although the Utah judgment did not address this issue, it nevertheless forecloses the claim.

"An insurer owes an implied duty of good faith and fair dealing to an insured." *M.A. v. Regence BlueCross BlueShield of Utah*, 479 P.3d 1152, 1158 (Utah Ct. App. 2020).[13] "The duty contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Id.* (citation and internal quotation marks omitted). "In the context of first-party insurance claims, an insurer acts reasonably in denying a claim if the insured's claim is fairly debatable." *Id.* (citation omitted).

The Utah judgment establishes Prime did not breach the implied covenant. Medicab agreed it never intended for the Commercial Policy to provide loading/unloading coverage; the Utah default judgment confirms as much. Given the Utah court order confirming the Commercial Policy only extended loading/unloading coverage due to mutual mistake, it cannot be said that Prime acted unreasonably in seeking to reform it to reflect the parties' actual intent.

---

[13] The Court previously determined that Utah law applies to Medicab Defendants' contract and tort claims. (Doc. 79 at 14; Doc. 86 at 12). So the Court applies Utah law here.

24

Because Medicab Defendants are collaterally estopped from relitigating these claims, the Court grants summary judgment in Prime's favor and against Medicab Defendants on counts I through III.

**C.    Medicab Defendant's Misrepresentation Claims (counts V–VI)**

Medicab Defendants bring misrepresentation (count V) and negligent misrepresentation (count VI) claims against Prime and PPCI.  To succeed on a claim for fraudulent misrepresentation, a plaintiff must establish the following elements: (1) a representation; (2) concerning a presently existing material fact; (3) which is false; (4) which the representor either (a) knew to be false, or (b) made recklessly; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did rely in fact upon it; (8) and was thereby induced to act; (9) to his or her injury and damage." *Miller v. HFN, Inc.*, No. 2:23-CV-00733-CMR, 2024 WL 4308355, at *8 (D. Utah Sept. 26, 2024).  "The elements of negligent misrepresentation are similar to those of fraud except that negligent misrepresentation does not require the intentional mental state necessary to establish fraud." *Kex Distribution v. Hanover Ins. Co.*, No. 2:20-CV-874-HCN-CMR, 2024 WL 4349159, at *7 (D. Utah Sept. 30, 2024) (citing *Shah v. Intermountain Healthcare, Inc.*, 314 P.3d 1079, 1085 (Utah Ct. App. 2013)).

Medicab Defendants' counterclaim lists a litany of purported misrepresentations, which can be summarized as follows:

25

1. That the Commercial Policy provided no coverage for the Estate's claim;
2. That Medicab's intent and understanding was that the Commercial Policy provided no coverage for loading and unloading persons from certain vehicles;
3. That Prime could legally and retroactively adjust the available coverage of the Commercial Policy;
4. That it was in Medicab's best interest to "agree" to reduce the insurance coverage; and
5. That agreeing to reduce the coverage would result in a settlement with the Estate for $100,000.

(Doc. 80 ¶¶ 114, 121).[14] The analysis for these claims differs between PPCI and Prime, so the Court tackles each in turn.

### 1. Misrepresentation Claims Against PPCI

Although the alleged misrepresentations were made by CDA or Prime agents, Medicab Defendants maintain the agents issued these misrepresentations on behalf of Prime, PPCI, and CDA through a joint agency relationship. (Doc. 80). In other words, they seek to impute each misrepresentation to both Prime and PPCI, regardless of who made the statements. Seeking summary judgment, PPCI argues that it made none of the purported misrepresentations, and Medicab Defendants have not established an agency relationship that would impute the statements to PPCI. (Doc. 153).

---

[14] Medicab Defendants' counterclaim alleges several statements by Prime and PPCI to third-parties, such as the Utah court or the Estate. However, they provide no authority suggesting misrepresentations issued to a third-party are actionable. So the Court only considers representations made to Medicab.

26

Medicab Defendants' claims against PPCI hinge on one fact: that Prime and PPCI are sister entities under CDA.  Given this affiliation, Medicab Defendants insist they all share a joint interest that imputes all statements to PPCI through an agency relationship.  But simply being affiliated companies is not itself sufficient to attribute Prime and CDA's statements to PPCI.  *See* Restatement (Third) Of Agency cmt. c § 1.01 (2006) ("Despite their agency relationship, a principal and an agent retain separate legal personalities."). "Roughly speaking, a principal is liable for the tortious conduct of the agent only if the conduct was tied to the subject matter of the agency." *United States v. Fernandez*, 24 F.4th 1321, 1338 (10th Cir. 2022).  Medicab Defendants produce no evidence establishing an agency relationship or that CDA and Prime made such representations pursuant to such relationship.

To the contrary, none of the alleged misrepresentations relate to PPCI or the Auto Policy.  Rather, all alleged misrepresentations pertain to coverage under the Commercial Policy, which Prime issued.  Nothing in the record suggests CDA and Prime's statements—about a policy that PPCI has nothing to do with—were made on behalf of PPCI or in any way benefited PPCI.  The Court thus grants summary judgment in PPCI's favor on counts V and VI.

27

### 2.    Misrepresentation Claims Against Prime

#### a.    Statements 1 and 2

Collateral estoppel precludes the first two alleged misrepresentations. Medicab Defendants claim Prime falsely represented that the Commercial Policy provided no coverage and that Medicab's intent and understanding of the Commercial Policy was that it provided no coverage for loading and unloading. As discussed above, the Utah court already determined that the Commercial Policy does *not* provide coverage and that the parties agreed their intent was that the Commercial Policy did not extend coverage for loading/unloading. Given the Utah court already addressed these issues, Medicab Defendants cannot show these statements were "false."

Even on the merits, these statements do not constitute misrepresentations because Ndungu confirmed his intent and understanding was that the Commercial Policy did not provide loading/unloading coverage. Harden wrote an email to Ndungu requesting confirmation that his "understanding and intent of the [Commercial] policy is that there is no coverage for the use of your autos, including but not limited to, loading and unloading persons onto those autos" because he "purchased a separate auto liability policy to cover that liability arising from that type of activity." (Doc. 169-22 at 16–17). She concluded the email by requesting Ndungu "confirm

28

that this accurately reflects" his "intent and understanding of those policies." (*Id.* at 17). Ndungu replied that he "agreed." (*Id.* at 16).

Given Ndungu's written agreement with Harden's statement, the statement (and others like it) was not false, let alone fraudulent. Although Ndungu now maintains he only agreed with Harden's statement because he was bamboozled into doing so, this purported deception does not alter the fact that Ndungu agreed. Thus, Prime's various representations regarding coverage and Medicab's intent and understanding of the Commercial Policy were not false, and they cannot give rise to a misrepresentation or negligent misrepresentation claim.

Another important point. The Court fails to understand how Medicab Defendants justifiably relied on any misrepresentation concerning Medicab's subjective intent of the policy. While this inquiry is normally for a jury, courts may conclude there was no justifiable reliance as a matter of law. *See Tidwell v. Jensen*, 586 P.3d 517, 527 (Utah 2026) (explaining "there are instances where courts may conclude that as a matter of law, there was no reasonable reliance"). If Prime misrepresented to Medicab *its own* intent or understanding of the policy, Medicab should have known immediately the statement was false and never relied upon it. *See* Restatement (Second) of Torts § 541 (1977) ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is

29

obvious to him."). So, for multiple reasons, the misrepresentation claims based on the first two statements fail.

### b.    Statement 3

As for the third alleged misrepresentation—that Prime could legally and retroactively adjust the available coverage of the Commercial Policy—Medicab Defendants have not shown this statement is false.  Indeed, "Utah law is clear that a mutual mistake of fact can provide the basis for equitable rescission *or reformation* of a contract even when the contract appears on its face to be a complete and binding integrated agreement." *Landmark Trucking, LLC v. Berkshire Hathaway Homestate Ins. Co.*, No. 2:24-CV-00708-DBB-JCB, 2026 WL 1194858, at *9 (D. Utah May 1, 2026) (emphasis original and citations omitted).  Further, they fail to establish how they were harmed by this statement.  Prime's statements regarding the legality of its own actions did not harm Medicab Defendants (and they have not shown otherwise).  And it is equally unclear how Medicab Defendants justifiably relied on this assertion. Their case rests on the premise that they *never* wanted the Commercial Policy reformed.  If true, how or why would they rely on Prime's assertion that it could legally reform the policy?  It makes no sense.  Thus, these statements cannot give rise to a misrepresentation or negligent misrepresentation claim.

30

### c.      Statements 4 and 5

At the outset, the Court concludes res judicata does not preclude Medicab Defendants from litigating the remaining statements.  The Utah judgment did not address issues such as whether it was in Medicab's "best interest" to agree to reduce its insurance coverage or whether such agreement would result in a $100,000 settlement with the Estate.  So these purported misrepresentations must be resolved on the merits.

The only argument Prime offers (other than res judicata) is that the amount of Medicab Defendants' claimed damages is unclear.  (Doc. 156 at 23–24).  But the *amount* of damages is not relevant at this stage.  Prime offers no argument that Medicab Defendants have not been damaged at all.  So while the Court questions the legitimacy of these claims, Prime provides no argument warranting judgment.   The misrepresentation and negligent misrepresentation claims thus survive as to these two statements.  The Court otherwise grants summary judgment in Prime's favor on counts V and VI.

### D.      Medicab Defendants' Breach of Fiduciary Duty Claim (count IV)

Medicab Defendants allege that they placed their full trust and confidence in Prime and PPCI to "act as their proper agent in defending and indemnifying the [Estate's] claim."   (Doc. 80 ¶ 108).   Prime and PPCI purportedly breached this duty by making false representations regarding coverage (the same ones discussed above), failing to defend under the

31

Commercial Policy, failing to reasonably and timely settle the Estate's claim against Medicab Defendants, and preventing defense counsel from exercising independent professional judgment in defending the underlying claims. (*Id.* ¶ 109). Prime again relies on res judicata principles in seeking summary judgment on this claim. And PPCI argues Medicab Defendants have not demonstrated it owed or breached any fiduciary duty under the Commercial Policy.

"Breach of fiduciary duty claims generally require proof of four elements: the existence of a fiduciary relationship (such as attorney-client, physician-patient, or insurer-insured); breach of the fiduciary duty; causation, both actual and proximate; and damages." *Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 417 P.3d 95, 109 (Utah 2018). Under Utah law, an insurer owes a fiduciary duty to an insured only in a third-party context. *See UMIA Ins., Inc. v. Saltz*, 515 P.3d 406, 416 (Utah 2022). This is because in the first-party context, the insured and insurer are, practically speaking, adversaries. *Id.* But the same is not true in a third-party situation, in which "the insurer controls the disposition of claims against its insured, who relinquishes any right to negotiate on his own behalf" and so "an insurer's failure to act in good faith exposes its insured to a judgment and personal liability in excess of the policy judgment." *Black v. Allstate Ins. Co.*, 100 P.3d 1163, 1169 (Utah 2004) (cleaned up and citation omitted). So a third-

party insurer has a fiduciary responsibility to act in good faith in protecting its insured's interests, including promptly and reasonably accepting or rejecting the insured's claim for coverage, defending the insured, diligently investigating the claims against the insured, and fairly and reasonably settling the claims against the insured. *Salz*, 515 P.3d at 416.

Medicab Defendants' claim arises from a third-party situation involving Prime and PPCI's purported duty to defend it against and resolve the Estate's claim. The problem is the Utah court already determined Prime had no duty to defend Medicab for the Estate's claim and that Medicab had no coverage under Prime's Commercial Policy. It follows then that Prime did not breach any third-party fiduciary duty. *Cf. Ctr. for Excellence in Higher Educ., Inc. v. RSUI Indem. Co.*, 375 F. Supp. 3d 1217, 1230 (D. Utah 2019) (holding that because the court already determined that the insurer properly denied coverage under the policy, it did not breach the covenant of good faith and fair dealing by failing to defend the insured in underlying lawsuit); *Jumlist*, 2022 WL 610402, at *9 (concluding a Utah default declaratory judgment precluded the plaintiff's subsequent breach of fiduciary duty claim).

As for PPCI, it had no duty to defend under the Commercial Policy because it did not issue it. Although PPCI owed Medicab Defendants a duty to defend under the Auto Policy, the record reflects PPCI timely tendered the full $100,000 policy limit and defended Medicab Defendants in the underlying

33

lawsuit. *Cf. Jumlist*, 2022 WL 610402, at *9 (finding the defendants "could not have breached the contract or been negligent for failing to settle when they tendered the Policy's limits"). They instead complain that PPCI directed defense counsel to appeal the $412,000 arbitration award, despite Medicab Defendants' request that PPCI instead accept the award and pay it. But PPCI had no obligation to pay anything beyond $100,000. So unless Medicab Defendants were willing to pay the remaining $312,000, it is unclear how PPCI directing defense counsel to appeal the arbitration award breached any fiduciary duty.

Medicab Defendants also argue that PPCI breached its fiduciary duty by colluding with CDA and Prime to retroactively eliminate Medicab's additional coverage under the Commercial Policy. (Doc. 169 at 17). But Medicab Defendants present no evidence of such collusion. So their fiduciary duty claim fails, and the Court grants summary judgment in Prime and PPCI's favor on count IV.

## E.    Prime's Declaratory Action

Prime also seeks summary judgment in its favor on its declaratory action claim. Prime seeks a declaration that (1) there is no coverage under the Commercial Policy for any claim from the Estate action or the underlying incident, and (2) Prime has no duty to defend Medicab Defendants in connection with the Estate action and the underlying incident. (Doc. 11). But

34

Prime already received such a declaration from the Utah court and domesticated it in Florida. Although there are additional parties in this action—*i.e.,* Rhodes and Johnson—the Utah judgment already binds them because they are in privy with Medicab (as discussed above). So, ironically, Prime's claim is barred by res judicata (both issue and claim preclusion), and awarding Prime judgment would be duplicative. The Court thus denies Prime's request for summary judgment on its declaratory judgment claim and dismisses the complaint with prejudice.

Accordingly, it is

**ORDERED:**

1. PPCI's Motion for Summary Judgment (Doc. 153) is **GRANTED**.

2. Medicab Defendants' Motion for Partial Summary Judgment (Doc. 155) is **DENIED**.

3. Prime's Motion for Summary Judgment (Doc. 156) is **GRANTED in part and DENIED in part.**

   a. The Court grants summary judgment in Prime's favor on counts I–IV of Medicab Defendants' counterclaim.

   b. The Court grants summary judgment in Prime's favor on counts V and VI of Medicab Defendants' counterclaim as outlined above. Counts V and VI otherwise survive.

35

    c.  The Court denies summary judgment on Prime's declaratory action claim and **DISMISSES** the complaint with prejudice.

    d.  The Clerk is **DIRECTED** to terminate Prime as a plaintiff in this action.  Prime remains a counterclaim-defendant.

4. The Clerk is **DIRECTED** to enter judgment in PPCI's favor and terminate PPCI as a party to this action.

5. The Court refers this case to a settlement conference with United States Magistrate Judge Nicholas P. Mizell.

6. A Trial Scheduling Order will be entered under separate cover.

**DONE** and **ORDERED** in Fort Myers, Florida on June 3, 2026.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record

36